### NYE v. WESTERN UNION TEL. CO.

(Circuit Court, D. Minnesota, Fourth Division. November 9, 1900.)

1. LIBEL—TELEGRAPH MESSAGE—LIABILITY FOR TRANSMISSION.

Where a message presented to the receiving clerk of a telegraph company for transmission is in language such that a person of ordinary intelligence, knowing nothing of the parties or circumstances, would not necessarily conclude that its purpose was defamation, it is his duty to send it, and for the performance of such duty the company incurs no liability.

2. SAME.

Defendant received in New York for transmission to plaintiff, in Minneapolis, a message signed by the sender, and stating that a person named had stated in the presence of the sender that plaintiff had been "bought up" by another person named, in a political campaign. Defendant's clerk who received and forwarded the message had no knowledge of any of the parties, or the matters referred to. *Held*, that there was nothing in the language of the message from which the clerk could reasonably have inferred that its purpose was to defame the plaintiff, to whom it was addressed, or to warrant a recovery against the defendant because of its transmission.

On Motion for New Trial.

Fred. H. Boardman and M. H. Boutelle, for plaintiff.
C. M. Ferguson, for defendant.

LOCHREN, District Judge. The petition of the defendant for an order setting aside the verdict and judgment in this action and granting a new trial was duly brought on for hearing on August

31, 1900, in the March, 1900, term of this court, and both parties appeared by their respective counsel. The action is to recover damages alleged to have been sustained by the plaintiff by the publication incident to the transmission over defendant's telegraph from New York to Minneapolis on the night of July 27, 1899, of two telegrams, below quoted, and the delivery of each to the person to whom it was addressed on the following morning, at Minneapolis, by defendant's messengers.

The first count in the complaint is based on the following telegram to M. H. Boutelle, an attorney at law of Minneapolis, having some business association with the plaintiff, who is also a practicing attorney of the same place:

"New York, 27th July, '99.

"Mr. Boutelle, New York Life Building: Judge Vanderburgh told me distinctly that your Mr. Nye was bought off by Pillsbury in 1896.
"9:44 p. m.                                        W. H. Vanderburgh."

The second count is based upon the following other telegram so delivered to the plaintiff:

"New York, 27th July, '99.

"Frank Nye: Judge Vanderburgh, who was elected district judge, Minneapolis, 1859, 1866, 1873, 1880, elected supreme judge 1881, 1886, stated distinctly in my presence that Charlie Pillsbury bought you up in 1896, otherwise you would have been for Bryan.
"9:11 p. m.                                        W. H. Vanderburgh."

The complaint sufficiently alleged the meaning and purpose of the telegrams to be to charge the plaintiff with having been bribed to sell his vote and political influence for a money consideration in the year 1896, and as being corrupt and dishonest. Upon the trial it was admitted that the defendant's servants in New York who received and transmitted these telegrams knew nothing of the plaintiff, nor of any facts or circumstances connected with the subject-matter of the telegrams; and it appeared that the telegrams were presented for transmission at different times the same evening, and at different stations of the defendant in the city of New York, by William H. Vanderburgh, and were transmitted in the customary manner.

On the trial the jury were instructed that there was nothing upon the face of the Boutelle telegram to advise the servants of defendant who received and transmitted it that it was defamatory, as the statement that Nye was bought off by Pillsbury in 1896 might well be understood to refer to a purchase of some claim or interest of Nye respecting property or property rights, and that plaintiff could not recover upon said first count. But the court refused to charge the jury, as requested by defendant:

"That there is not sufficient evidence in this case to establish a cause of action against the defendant with respect to the telegram addressed to the plaintiff, set forth in the complaint as the second cause of action, and with respect to such cause of action your verdict must be for the defendant."

The defendant duly excepted to this refusal to charge, and also to that portion of the charge which in effect left the jury to determine whether, upon the face of the message, it appeared that its only pur-

pose was to defame and slander the plaintiff, so that the receiving clerk, if a person of ordinary intelligence, would so understand it, in which case, only, the defendant would be liable in damages for its publication to its own employés who might read it in the transmission, but that if the terms of the dispatch were such that the receiving clerk might properly regard it as an answer to an inquiry by plaintiff, or as a communication for any purpose other than defamation, the defendant would not be responsible. The jury returned a verdict for the plaintiff on this cause of action for the sum of $500, which establishes the fact that the imputation upon plaintiff mentioned in the message is false and defamatory. The sole question to be considered is whether the court erred in refusing to charge the jury in the language of the above-quoted request, and in submitting, as it did, the consideration of said second cause of action to the jury.

The electric telegraph is so useful and constantly employed in the conduct of human affairs that its lines of wires cover all civilized lands, cross the great oceans, and reach every city, and nearly every hamlet. The law, recognizing the need that every one may have for its services, imposes upon it the duties of common carrier, and by statutes in New York, Minnesota, and most of the states, requires telegraph companies, under penalties, to transmit promptly, and in the order of their reception, all messages presented for transmission, upon payment of reasonable charges. While none of these statutes makes any exception as to the character of the messages which may be offered for transmission, and while it is certain that no telegraph company can assume to act as censor as to the language of messages, or the purpose they are intended to accomplish, yet, as a common carrier of persons, though bound to carry every one who pays the fare, may exclude from his vehicle a person having a loathsome contagious disease, so, equally, it would be the right and duty of a telegraph company to refuse to transmit a message which upon its face is obscene, profane, or clearly libelous, and manifestly intended only for the purpose of defamation. That a message may contain matter which, if false, is libelous, and still be proper to be transmitted, cannot admit of doubt,—as where the object is to secure the arrest of a person charged with crime, or to give information to one having an interest in the matter, or anything of a privileged character. In any such case the telegraph company could not refuse to send the message, and would not be responsible if a message which, for aught that appeared on its face, might be privileged, were in fact sent with a defamatory or mischievous intent. In Peterson v. Telegraph Co., 65 Minn. 18, 67 N. W. 646, 33 L. R. A. 302, the court says:

"When a proffered message is not manifestly a libel, or susceptible of a libelous meaning, on its face, and is forwarded in good faith by the operator, the defendant cannot be held to have maliciously published a libel, although the message subsequently proves to be such in fact. In such a case the operator cannot wait to consult a lawyer, or forward the message to the principal office for instructions. He must decide promptly, and forward the message without delay, if it is a proper one, and for any honest error of judgment in the premises the telegraph company cannot be held responsible. But where

the message, on its face, is clearly susceptible of a libelous meaning, is not signed by any responsible person, and there is no reason to believe that it is a cipher message, and it is forwarded under such circumstances as to warrant the jury in finding that the operator in sending the message was negligent or wanting in good faith in the premises, the company may be held to have maliciously published the libel. A publication under such circumstances is not privileged."

The receiving clerk scans a message rapidly to see that it is legible, and, from its direction and number of words, to determine the charge of sending. Having no duty of censorship, or right to catechise the sender, if he acts in good faith, and the language of the message is such that a person of ordinary intelligence, knowing nothing of the parties or circumstances, would not necessarily conclude that defamation was the object and purpose of the message, it would be his duty to send it, and for his performance of that duty the telegraph company would incur no responsibility. This telegram had the sender's signature. It was directed to the very person spoken of, and who might have an object in ascertaining exactly what Judge Vanderburgh had said concerning him, and might have sought that information from the sender. If the receiving clerk gave a thought to the purport of the message, he would be much more likely to infer this than that it was intended to defame the very person to whom it was sent, and who by simply casting it into the fire could effectually prevent its publication, save the technical publication to the small number of employés, bound to secrecy, who may have seen it in the transmission, and, knowing nothing of the parties or of the matter, would be unlikely to give it a thought. A purpose on the part of the sender of a message like the one under consideration to thereby defame and injure the very person to whom it was sent would be too improbable to be apparent and manifest to the receiver of the message for transmission, whatever may have been the actual purpose of the sender. Any rule imposing a stricter responsibility upon telegraph companies in respect to the character of messages transmitted than is above indicated would be productive of such embarrassment and delays, and make necessary such annoying inquiries, as to greatly diminish the efficiency of the service, and subject telegraph companies on the one hand to danger of prosecutions and suits for refusal to transmit messages or to transmit them promptly, and on the other to vexatious actions for fancied injuries, and even to conspiracies between senders and addressees to mulct these supposedly wealthy corporations. The experience of the half century since telegraphs have come into general use discloses no reason for requiring of telegraph companies more than such ordinary care and good faith as can be exercised in view of the necessity for prompt action, admitting of neither inquiry nor delay. On more careful consideration than could be given to the subject in the hurry of the trial, I am satisfied that there is nothing in the language of this message likely to cause the receiving clerk to infer that the purpose was to defame the plaintiff, to whom the message was sent. He might as fairly infer that it was sent either in answer to an inquiry, or for the friendly purpose of informing the plaintiff of injurious statements made concerning him by another.

It was error, therefore, to refuse the above-quoted instruction to the jury, who should have been directed to return their verdict for the defendant. Ordered, that the judgment and verdict in this case be vacated and set aside, and a new trial granted.