JOSEPH GRISHAM and NETTIE M. GRISHAM, Appellants, v. WESTERN UNION TELEGRAPH COMPANY, CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, and JOHN M. BEER.

Division Two, December 19, 1911.

1. **LIBEL: Telegraph Operator: Text-Book Commission: No Proof.** It is the legal duty of a telegraph operator to send a message deposited with him, upon payment or tender of charges, if it is expressed in decent language and is not manifestly libelous; and where there is no proof that the agent knew that the County Text-Book Commission was in session for the

purpose of receiving bids and adopting a series of text-books for use in the schools of the county, on the day that the agent of a certain publishing house deposited with him a message to his house reciting "board here sold out," or that said agent was the representative of a competing bidder, or that said agent had appeared before said commission, or that the word "board" meant said commission, or that said words meant to charge that the members of the commission had been bribed, a member of said board fails to make out a case of libel against the telegraph company.

2. ———: ———: **Manifestly Libelous: Ambiguity.** The statutes do not compel a telegraph operator to send a message that is manifestly libelous; but unless it is manifestly libelous or indecent in its expressions, he must send it. But any doubt or ambiguity as to its libelous character is to be resolved in favor of the operator when he and his company are sued for libel; and if the message deposited with him, unexplained and disconnected from extrinsic facts, of which he is not shown to have any knowledge, has in it no language to suggest a libelous meaning, the plaintiff cannot recover.

Appeal from Schuyler Circuit Court.—*Hon. Nat M. Shelton*, Judge.

AFFIRMED.

*Fogle & Fogle, W. M. Saxbury* and *Rolston & Rolston* for appellants.

(1) The petition states a cause of action. Ukman v. Daily Record Co., 189 Mo. 378; 13 Ency. Pl. & Pr. 40; Atwinger v. Fellner, 46 Mo. 276; Kenworth v. Journal Co., 117 Mo. App. 327. (2) As respects a publication by writing a libel, not only the publisher, but all who in anywise aid or are concerned in the production of the writing, are liable as publishers. If one composes and dictates, a second writes, and a third publishes, each and all are liable as publishers. Buckley v. Knapp, 48 Mo. 152; Arnold v. Savings Co., 76 Mo. App. 159. (3) A corporation is liable in damages for the publication of a libel, as it is for its other torts. Quigley v. Railroad, 21 How. (U. S.) 202; 25 Cyc. 428,

n. 98; 10 Cyc. 1215, sec. 4.   (4) Corporation may be held for libel.   Bishop on Torts, sec. 728; Johnson v. Dispatch Co., 65 Mo. 539; 2 Wilgus, Corp., p. 1258. (5) A railroad corporation may be liable in damages for a libel published by its agents in the course of their employment.   10 Cyc. 1215; Railroad v. Quigley, 21 How. (U. S.) 202; Gas, etc. Co. v. Lansden, 173 U. S. 543.   (6) A master is liable for the publication of defamatory matter by his agent in the line of his duty though the principal did not authorize it.   Newell on S. & L., 376; Fogg v. Barton L. & R. Co., 20 N. E. 109; Garrepzen v. Dunckel, 50 Mo. 104; McCord v. Tel. Co., 39 N. W. 315.   (7) A telegraph company is held liable for its agent's sending a libelous telegram.   Cooley on Torts, p. 139; Peterson v. Tel. Co., 77 N. W. 985. (8) A railroad company falsely published through their electric telegraph that a bank had stopped payment, held liable.   Whitfield v. Railroad, 37 L. J., Q. B.; 2 Addison on Torts, sec. 1140.   (9) To transmit over its lines to an addressee, a message libelous on its face, is a publication of a libel for which the company can be held responsible, since in such a case not only the addressee, but also all of the company's agents through whose hands the dispatch must pass, are made acquainted with its contents. 25 Am. and Eng. Ency. (1 Ed.), 281.   Libelous letter sent through the mail to plaintiff is libelous *per se*.   Houston v. Wooley, 37 Mo. App. 15; R. S. 1899, secs. 2259-61.   All libels are actionable *per se*.   Kenworth v. Journal Co., 117 Mo. App. 327.   (10) A telegraph company is liable for the acts of its agents within the scope of their authority.   So where a libelous message is maliciously transmitted by an agent of the company, within the scope of his employment, punitive damages therefor may be recovered against the company.   1 Joyce on Dam., sec. 409.   (11) A railroad operating a line of telegraph may be liable in transmitting over its line to different stations, libelous matter concerning a per-

son. 10 Cyc. 1215; Whitfield v. Railroad, E. B. & E. 115. (12) For acts done by the agents of a corporation, either in *contractu* or in *delicto* in the course of its business and of their employment, the corporation is responsible as an individual is responsible under similar circumstances. Cooley's Torts, 227; Johnson v. Dispatch Co., 2 Mo. App. 565; Lathrop v. Adams, 133 Mass. 471; Fogg v. Railroad, 20 N. R. 109. (13) An agent has a right to refuse to send a telegram that is obscene, slanderous, blasphemous, profane or the like. Telegraph Co. v. Lillard, 110 S. W. 1035. (14) Notice to the agent of matter in his line of duty is notice to the principal. Cox v. Pearce, 20 N. E. 566; Larsen v. Railroad, 110 Mo. 234; Barker v. Railroad, 126 Mo. 143. (15) The answer of the defendant Western Union Telegraph Company, and the defendant Beer, and the first answer of the defendant railroad, amounts to no answer at all and all of the allegations in the plaintiff's petition were virtually admitted. Dezell v. Fidelity and Casualty Co., 176 Mo. 279. (16) When a proffered message is not manifestly a libel or susceptible of a libelous meaning on its face, and is forwarded in good faith by the operator, the defendant cannot be held to have maliciously published a libel, but where the message is susceptible of a libelous meaning and is not signed by any responsible person, and there is no reason to believe it is a cipher message, and it is forwarded under such circumstances as to warrant the jury in finding that the operator in sending the message, was negligent or wanting in good faith in the premises, the company may be held to have maliciously published a libel. A publication under such circumstances is not privileged. Peterson v. Telegraph Co., 65 Minn. 18. (17) If Beer knew that the telegram was libelous, or if he knew of the circumstances and the parties to whom the word "board" referred, or if he had reasonable grounds, as a man of ordinary intelligence, to know the facts and circum-

stances and still sent the telegram, he and the other defendants are liable. Nye v. Tele. Co., 104 Fed. 930. (18) Evidence which shows that the defendant could have ascertained from his books that the statements published are false, justifies an instruction for punitive damages on the grounds of gross carelessness or recklessness. Lanius v. Druggist Pub. Co., 20 Mo. App. 12. (19) If the publication is false and plaintiff has suffered actual damages, he is entitled to recover such damages, no matter how innocently, or with what purpose, intent or motive, defendant acted. Farley v. Pub. Co., 113 Mo. App. 27; Jones v. Murray, 167 Mo. 25; Ukman v. Daily Record Co., 189 Mo. 378. (20) Intent or knowledge of the libelous matter is not necessary to make one liable. Curtis v. Mussey, 6 Gray, 261; Farley v. Publishing Co., 113 Mo. App. 216; Jones v. Murry, 167 Mo. 25. (21) A defendant is liable for what is insinuated as well as for what is stated explicitly. Merrill v. Post Pub. Co., 83 N. E. 419. (22) Plaintiff may show by extrinsic evidence that the words apply to him, although not named. 25 Cyc. 493; Kenworth v. Journal Co., 117 Mo. App. 337; Newell on Libel & Slander (2 Ed.), 250; Caruth v. Richeson, 96 Mo. 186. (23) In an action for libel on demurrer to the petition where the language of the alleged libel is doubtful, the court will ascertain if there is anything in the language which by reasonable intendment is actionable, and in determining the meaning of the words will consider extrinsic facts and circumstances with which they are connected. Mfg. Co. v. Western Fruit Grower, 126 Mo. App. 139. (24) And where the person is ambiguously described extrinsic evidence may be admitted to establish the identity. Mix v. Woodward, 12 Conn. 262; Van Vetchten v. Hopkins, 5 Johns. 211; 25 Cyc. 503. (25) A person who reads a libelous publication may testify as to whom he understood it to refer. Enquirer Co. v. Johnston, 72 Fed. 443. (26) Though plaintiff's name was not used in the alleged

libelous article, still if readers understood it to refer to plaintiff and the sense in which the words were used, then this is admissible testimony. Ball v. Eben Am. Co., 86 N. E. 1097. (27) Plaintiff may call in friends or those acquainted with the circumstances, to state that on reading the libel they at once concluded that it was aimed at the plaintiff. Kenworth v. Journal Co., 117 Mo. App. 336; 25 Cyc. 362. (28) When the words have a harmless or an injurious meaning it is a question of fact for the jury to say which meaning was intended. Newell on S. & L. (2 Ed.), 769; Birch v. Benton, 26 Mo. 153; McGinnis v. Knapp & Co., 109 Mo. 131; Dollarer v. Bashey, 16 Pa. St. 204. (29) If the words are capable of two meanings, one harmless and the other defamatory, then it is a question for the jury. Dunnell v. Fish, 11 Met. 52; Downs v. Hawley, 112 Mass. 237; Twone v. Monroe, 136 Mass. 464; Hoare v. Silverlock, 12 Q. B. 624; Fray v. Fray, 17 C. B. N. S. 603. (30) If the language is ambiguous, the construction is in what sense hearers understood it. Caruth v. Richeson, 96 Mo. 186. (31) The jury now decide upon the facts, what the words do mean. Fallenstein v. Booth, 13 Mo. 428; Stuber v. Wennel, 19 Mo. 513; Hudson v. Garner, 22 Mo. 423; Speaker v. McKensie, 26 Mo. 255; Birch v. Benton, 26 Mo. 153; Bishop, Non-Contract Law, sec. 277. (32) In determining the meaning of doubtful words the jury may take into consideration all the surrounding facts. Reddell v. Thayer, 127 Mass. 487; Kenworth v. Journal Co., 117 Mo. App. 327; Julian v. Star Co., 209 Mo. 35. (33) The plaintiff may give evidence of surrounding circumstances from which a defamatory meaning may be inferred and then it is for the jury. Newell on S. & L., 769; Carter v. Andrews, 16 Pick. 1; Kenworthy v. Journal Co., 117 Mo. App. 327; Julian v. Star Co., 209 Mo. 35.

*Charles E. Yeater* for respondents.

(1) If no case of actionable libel has been made on the plaintiff's evidence, the court may give a peremptory instruction for a verdict for defendant. Heller v. Pulitzer Pub. Co., 153 Mo. 213; Ukman v. Daily Record Co., 189 Mo. 390; Branch v. Knapp & Co., 222 Mo. 596. (2) Where the facts are undisputed the question of privilege is a question of law for the judge. Callahan v. Ingram, 122 Mo. 365; Sullivan v. Commission Co., 152 Mo. 283; Holmes v. Royal Fraternal Union, 222 Mo. 569. (3) To a communication belonging to a class privileged in law, made in good faith, the law does not imply malice, as in the ordinary case of libel, and actual malice must be proven before there can be a recovery, and in the absence of substantial evidence of such malice a nonsuit should be granted. Finley v. Steele, 159 Mo. 306; Holmes v. Royal Fraternal Union, 222 Mo. 568. (4) The transmission and delivery of a telegraphic message thus being an imperative duty, required by the statutes of Missouri for many years, creates an absolute privilege, subject solely to the qualification that a liability can arise only in the event that the company's agent knows that the message is false, and in addition knows that it libels some person, and is guilty of actual malice in sending it for the purpose of defaming such person. (5) When the language of the message is ambiguous, and a doubt arises as to the propriety of the message, the operator must resolve that doubt in favor of the sender and forward the message. Tel. Co. v. Ferguson, 57 Ind. 495; Gray v. Tel. Co., 87 Ga. 350; Commonwealth v. Tel. Co. (Ky.), 67 S. W. 59. (6) The telegram from Maddock to his employer, Silver, Burdett and Company, was confidential between them and privileged, and there could be no recovery against either of them without proof of express malice on the part of Maddock, and *a fortiori* no liability against the

telegraph company which exercised a governmental function in furnishing a speedier means of secret communication than the mails, with a duty to forward every dispatch unless manifestly improper on its face under penalty of a fine and jail imprisonment. 25 Cyc. 397, 12b; Sullivan v. Commission Co., 152 Mo. 268; Cases cited in Finley v. Steele, 159 Mo. 299. (7) (a) Plaintiffs' objections to the exclusion of evidence is not well taken, even if the court erred, because such error would have been immaterial by reason of the fact that none of the questions elicited information on the point essential to make a case; (b) and with two exceptions the objections were not properly saved and made so as to advise the court of the materiality of the answer; (c) and such rulings of the trial court on the record are correct in every instance. (a) State ex rel. v. Railroad, 105 Mo. App. 214; O'Shea v. O'Shea, 91 Mo. App. 232; 3 Cyc., p. 385; 3 Am. Dig., col. 2167, sec. 4193; col. 1933, sec. 4035; 3 Dec. Ed. Am. Dig., sec. 1029, sec. 1056 (6) [a]; Dee v. Nachbar, 207 Mo. 698; Bishop v. Brittain Inv. Co., 229 Mo. 734; Moore v. Railroad, 176 Mo. 547; Hesselbach v. St. Louis, 179 Mo. 522; Board of Education v. Surety Co. 183 Mo. 183; Swope v. Ward, 185 Mo. 329; Cass County v. Bank, 157 Mo. 137; (b) Ruschedberg v. Southern El. Co., 161 Mo. 81.

FERRISS, J.—Suit for libel by plaintiffs, husband and wife, because of the sending over the wires of the defendant Telegraph Company, by its agent, in Lancaster, Schuyler county, Missouri, the following telegram, which it is claimed libeled the wife, Mrs. Nettie Grisham:

7—5—1907.

To Silver Burdett & Company,
    378 Wabash Ave.,
        Chicago.
        Board here sold out Memphis Saturday morning Dockery Hotel Kirksville Saturday night.      ·      W. H. M.

The case was tried before a jury. At the close of plaintiffs' evidence the court sustained a demurrer, and directed a verdict for defendants. Plaintiffs appeal.

The facts disclosed by the evidence are as follows:

The plaintiff, Nettie Grisham, was a member of the school board of Schuyler county. Under the Act of 1907 this board constitutes a Text-Book Commission. This commission advertised in two county papers a notice, with this caption, "Notice to Publishers of School Text-Books," to the effect that bids would be received, on July 5th following, for school books for use during the ensuing year in the public schools of Schuyler county. This notice specified the subjects for which text-books were desired. The notice was signed: "Mrs. Nettie H. Grisham, president; J. F. Botts, secretary."

There appeared before the board, at the meeting held July 5, agents for several publishers, among them W. H. Maddock, for the Silver Burdett Book Company, Chicago. While the board was in session Mrs. Grisham telephoned several times to defendant Beer, who was the local operator for the defendant Telegraph Company, to know whether there were any packages for herself or Mr. Botts; that the board was busy at work and wanted the books from Ginn & Co., but did not advise him that the board was sitting as a text-book commission. Beer was also the express agent in Lancaster. Mrs. Grisham had merely a casual acquaintance with Beer. Copies of the papers containing the advertisements had been sent to Beer by the publishers, under the terms of a contract covering an advertisement for the railroad in such papers, to enable Beer, who was also station agent, to cut out same and send to the company for checking purposes.

From the testimony of E. C. Hickey, one of the book agents in attendance at Lancaster on that day, it appears that the board decided to postpone any announcement on the bids for a week. This witness testified:

"I left Lancaster that day on the 'Q' train going east, shortly after six o'clock. I was at the depot, I would guess, twenty minutes before the train arrived. There were six book men representing book companies at the depot at that time besides myself. Q. Was the question of the adoption of books by the Schuyler County Board of Education discussed among the book men at the depot at that time? A. There seemed to be quite an interesting discussion among the agents, myself included, at the east end of the depot, but I was not near enough to hear more than an occasional word. Q. Do you know whether or not there was any discussion in the waiting-room of the depot in reference to the adoption of the books? A. Mr. Maddock and Mr. Chapman were engaged in a low conversation regarding the matter, but the purport of their remarks I at no time caught the full meaning of. They were apparently conferring over the sending of a telegram. The station agent at that time was engaged at the key board, sending or receiving a message. Mr. W. H. Maddock prepared and delivered to the station agent a telegram. I saw him write it. After that I heard him say to Mr. Chapman: 'Chap, will this do all right?' to which Mr. Chapman answered, 'That's the proper stunt.' He then walked into the ticket room, laid the telegram down at the right side of the operator, who was seated at his desk. When he got the operator's attention, he asked him the cost of sending the message, also stating that he was anxious to get the message off at once. When Mr. Maddock wrote the telegram he was standing at the window in the waiting-room. I saw him writing the telegram, but had not noticed the blank before. The telegram was

written on the regular form of blank furnished by the Telegraph Company. Mr. Maddock then paid the agent for sending the telegram. I read the telegram after it was written by Mr. Maddock. I read it twice. When I read it the first time it was lying on the operator's desk before he sent it. When I read it the second time it was in the same position, while I suppose it was being sent. When I read it the first time I had stepped into the ticket office, ostensibly to get a ticket; in reality, to see the contents of the message. When I read it the second time, I was standing on the depot platform before an open window and in front of the operator's desk. The operator was present. Q. State if you heard any further conversation between the agent and Mr. Maddock other than you have stated? A. But a query, 'Will that message get through all right to-night?' to which the agent answered, 'I think it will.' I did not hear any other conversation between the agent and the representatives of the book companies. The agent was at his desk when Mr. Maddock wrote the telegram.''

Mr. Botts, a member of the board, testified that he sometimes got books by express, addressed to him as a member of the board of education.

Plaintiffs offered to prove that Maddock made ''insinuating remarks'' on the way to the depot and at the hotel; objection to which was sustained.

Witness Hickey was asked what construction he put upon the message; objection to which question was sustained.

Another witness was asked this question: ''Was it not currently reported around here in town, after these book agents left, that the board had sold out?'' Objection sustained. To all of these rulings plaintiffs excepted. The court instructed the jury to find for each defendant.

The theory of the plaintiffs appears from this extract taken from their brief:

"Said Beer well knew that said telegram referred to and meant the county board of education, and he well knew that Nettie Grisham, one of the plaintiffs, was a member of that board. He knew that the language of said telegram, to-wit, 'Board here sold out,' meant that said board had been bribed. He knew that Maddock meant to charge the board with being bribed. He knew that Silver, Burdett & Co., the great book concern of Chicago, understood that said telegram meant to charge the board here with being bribed. All of this he knew, and well knew it before he sent said telegram."

The proof utterly fails to establish the foregoing allegations, with the possible exception that Beer did know that Nettie Grisham was a member of the school board.

There is no proof that Beer knew that the board was in session that day as a text-book commission for the purpose of receiving bids, or that any agents appeared before that commission. It cannot be presumed that he read in the newspaper a notice addressed to publishers of text-books. There is no proof that he knew that the expression "board here sold out" meant that the school board had been bribed. There is no evidence of any communication to him, or of any knowledge conveyed to him in any manner, aside from the telegram itself, which would explain the meaning of these words. If there was ambiguity in the language, it was still his duty to send the message without investigation. Under the law it is the duty of the agent to send the message, if it is expressed in decent language, on payment or tender of the charge. [W. U. Tel. Co. v. Ferguson, 57 Ind. 495; Gray v. W. U. Tel. Co., 87 Ga. 350; Commonwealth v. W. U. Tel. Co., 112 Ky. 355.]

Section 3330, Revised Statutes 1909, makes it the duty of a telegraph company to receive a dispatch from any individual, and, on payment of the usual charge,

to transmit and deliver it to the addressee promptly, impartially and in good faith, under a penalty of $300 for every neglect or refusal so to do. Section 3334 provides a penalty of $50 for disclosing the contents of a message to any person other than the addressee. Section 4810 provides that any employee of a telegraph company who willfully refuses or neglects to transmit or deliver a message, or discloses the contents except to a court of justice or the addressee, shall be deemed guilty of a misdemeanor, and punished (section 4630) by imprisonment in the county jail not exceeding one year, or by fine not exceeding $500, or by both such fine and imprisonment.

These statutes would not compel the sending of a telegram that was manifestly libelous. [Nye v. W. U. Tel. Co., 104 Fed. 628; Peterson v. Tel. Co., 65 Minn. 18.] But unless it is manifestly a libel the operator must send it. Any doubt or ambiguity is to be solved in favor of the message. On this point the Supreme Court of Georgia says: "On no other rule would it be practicable for the telegraph companies to perform their legitimate functions as servants of the general public. They could not wait to question and investigate the motives of those who offer ambiguous dispatches for transmission." [Gray v. W. U. Tel. Co., supra.]

Counsel for plaintiffs have furnished us a voluminous brief of the law of libel, presenting fairly and fully all phases of the subject, with authorities cited. Appellants, in their brief, state the law as follows (Italics are theirs):

"Now then, let us see what the rules are that are laid down by the law that makes the defendants liable. In the case of Nye v. Western Union Telegraph Company, 104 Fed. 628, the court lays down the rule as follows: 'Where the message presented to the receiving clerk of the telegraph company for transmission is in language such that a person of ordinary

intelligence, knowing *nothing of the parties or the circumstances,* would not necessarily conclude that its purpose was defamation, it is his duty to send it, and for the performance of such duty the company incurs no liability.'

"In the case of Peterson v. Telegraph Company, 65 Minn. 18, the court says: 'Where the proffered message is not manifestly a libel, or susceptible of a libelous meaning, on its face, and is forwarded in good *faith* by the operator, the defendant cannot be held to have maliciously published a libel, although the message subsequently proves to be such in fact. In such a case the operator cannot wait to consult a lawyer, or forward the message to the principal office for instructions. He must decide promptly, and forward the message without delay, *if it is a proper one,* and for any honest error of judgment in the premises the telegraph company cannot be held responsible. But where the message, on its face, is clearly susceptible of a libelous meaning (and this one was, 209 Mo. 79), is not signed by any responsible person, and there is no reason to believe that it is a cipher message, and it is forwarded under such circumstances as to warrant the jury in finding that the operator, in sending the message, was negligent or wanting in good faith in the premises, the company may be held to have maliciously published the libel. A publication under such circumstances is not privileged.' A telegram cannot be privileged because it passes through the hands of unprivileged persons."

Measured by the foregoing rules, it is clear that the circuit court committed no error in sustaining a demurrer to the evidence.

Here is the situation: The defendant Beer is sitting at his table, working the telegraph keys. A stranger steps up and lays down a telegram, written on the usual blank, without punctuation. The original mes-

sage was offered in evidence, and is copied into the record thus:

Form No. 2.

## THE WESTERN UNION TELEGRAPH COMPANY.

————INCORPORATED————

**21,000 OFFICES IN AMERICA. CABLE SERVICE TO ALL THE WORLD**

THOS. T. ECKERT, President and General Manager

| Receiver's No. | Time Filed. | Check. | |
|---|---|---|---|
| Ca C. B. R. | 7:13 p. | 12 paid cash   46   Night | |

**SEND** the following message subject to the terms on back hereof, which are hereby agreed to.     7 - 5     **1907**

To     *Silver Burdett & Co.*

*378 Wabash Ave.,*

*Chicago.*

| | | | |
|---|---|---|---|
| | Board here | sold out | |
| Memphis | Saturday | morning | |
| Dockery Hotel | Kirksville | Saturday | night |
| | | W. H. M. | |

The sender asks and pays the price of service, and asks further whether there can be prompt delivery. Beer, so far as the record discloses, heard no conversation before the message was handed to him, knew nothing about a meeting of the Text-Book Commission, and did not know that the sender was a book agent. He had no knowledge of any kind about the meaning of the message, save such as he would gain from the telegram itself. There is nothing in the language of the message, unexplained, and disconnected from extrinsic facts, to even suggest a libelous meaning. It might have one of several meanings, depending on the punctuation. It was not the duty of the operator to study this telegram to try to determine

its meaning. A large proportion of the messages that pass through his hands are more or less obscure. His first duty is prompt service. The law does not require him to look for a meaning not manifest on the face of the telegram. There is nothing in the record to challenge the good faith of Beer, and nothing to impute knowledge to him that the message referred to the board of education or any member thereof.

There was no reversible error in the rulings on the admission of evidence. The judgment is affirmed. *Kennish, P. J.,* and *Brown, J.,* concur.