FLYNN, Appellant, vs. WESTERN UNION TELEGRAPH COM-
PANY, imp., Respondent.

*April 29—June 4, 1929.*

For the appellant there was a brief by *Morgan & Johns* of Appleton and *J. W. Kintzinger* of Dubuque, Iowa, and oral argument by *Mr. John Morgan* and *Mr. Kintzinger*.

For the respondent Western Union Telegraph Company there was a brief by *Ryan, Cary & Ryan* of Appleton, attorneys, and *Francis R. Stark* of New York City, of counsel, and oral argument by *Paul V. Cary* and *Patricia Ryan*.

OWEN, J. The complaint alleges that the defendants Reinke and Court composed and delivered to the Western Union Telegraph Company, at Appleton, Wisconsin, the following message:

"Appleton, Wisconsin, December 14, 1927. Lawrence A. Flynn, 2159 Faye street, Dubuque, Iowa. Advise Pace by wire how you wish to settle with us on money collected from Anton Lange, Neenah, or else face embezzlement charge along with Martin, who is now under arrest. Martin states you were in with him on this collection. Lange also says you were present helping take money. Prompt settlement or warrant will be issued at once. (Signed) Reinke & Court."

The defendant Western Union Telegraph Company received said message, transmitted it over its wires, and delivered the same to the plaintiff at Dubuque, Iowa. The complaint demands damages from both said defendants in the sum of $10,000. The question is whether the demurrer of the Western Union Telegraph Company to the complaint was properly sustained.

In support of the order the respondent contends that the message is not libelous *per se*. The message plainly charges the plaintiff with the crime of embezzlement, and the contention that it is not libelous upon its face is purely fatuous. Further discussion of this question will not be indulged.

The real question presented is whether the telegraph company is liable in damages by reason of the transmission of a libelous message over its wires. Upon this question we find

very few precedents. It received consideration in *Whitfield v. South Eastern R. Co.* 96 Eng. C. L. 113; *Great Northwestern Tel. Co. v. Archambault,* 30 Lower Canada Jurist, 221; *Dominion Tel. Co. v. Silver,* 10 Canada Sup. Ct. Rep. 238; *Peterson v. Western Union Tel. Co.* 65 Minn. 18, 67 N. W. 646; *Paton v. Great Northwestern Tel. Co.* 141 Minn. 430, 170 N. W. 511; *Stockman v. Western Union Tel. Co.* 10 Kan. App. 580, 63 Pac. 658; *Nye v. Western Union Tel. Co.* 104 Fed. 628; *Western Union Tel. Co. v. Cashman,* 149 Fed. 367.

In *Whitfield v. South Eastern R. Co., supra,* the only point urged against the liability of the telegraph company was the contention that a corporation could not be guilty of malice. The court having resolved that question in the affirmative held the company liable. In *Dominion Tel. Co. v. Silver,* 10 Can. Sup. Ct. Rep. 238, it appeared that the telegraph company acted as newsgatherer and collected, composed, and transmitted over its wires an item of news. In that case the telegraph company composed as well as transmitted the libelous message, and the grounds of its liability could not be confined to the mere act of transmission of a message delivered to it. In *Western Union Tel. Co. v. Cashman,* 149 Fed. 367, it was held by the circuit court of appeals for the Fifth circuit that a telegraph company is not liable for the mere transmission of a libelous message over its wires. The other cases above cited seem to be authority for the proposition that a telegraph company is liable for the mere transmission of a libelous message over its wires.

The fact that this question has not arisen in more than a half dozen jurisdictions throughout the English-speaking world indicates, first, that the security of moral character is not greatly threatened by the usual and ordinary conduct of the telegraph business, and second, that judicial thought upon the question is but in the formative period, and that

an original consideration of the subject is not wholly presumptuous.

Malice is an essential ingredient of actionable libel. Malice may be either actual or implied. To say that a telegraph company is prompted by actual malice towards the recipient of a message transmitted over its wires in the ordinary course of business is mere fatuity. If the malice essential to support an action for libel can be found under such circumstances, it must be imputed by law. "Malice in law is such as the law infers to exist without just or lawful excuse." Newell, Slander & Libel (4th ed.) § 275. "If false and defamatory statements are made concerning another without sufficient cause or excuse they are legally malicious." *Ibid.* § 277. The law will impute malice where a defamatory publication is made without sufficient cause or excuse. That the law recognizes circumstances under which malice should not be so imputed is apparent when we consider that branch of the law of libel comprehended under privileged and *quasi*-privileged communications. The law will impute malice where necessary to protect the interest of society and the security of character and reputation. But it tolerates a balancing of considerations, the weighing of benefits to result, and where the welfare of society is better promoted by a freedom of expression malice will not be imputed. In such cases the communication is classified as privileged or *quasi*-privileged in the law. Under such circumstances the individual is required to surrender his personal rights for the benefit of the common welfare. With these principles in mind, let us consider the nature of a telegraph company and its business.

It is well settled that a telegraph company is a public-service corporation. It is chartered and licensed by the government to furnish a necessary service to the public, namely, the prompt and rapid transmission of messages. It is an

agency that has contributed much to the present-day business pace. It has placed distant parts of the world in touch. It summons absent relatives to the bedside of the dying. It is a vital organ of our social system. The promptness with which it dispatches its business is the test of its efficiency and the measure of its service to public needs. Its service should not be hampered without deliberation nor for light and transient causes. To charge a telegraph company with the liability here sought to be imposed requires it to have as its acceptance agents those who are competent to determine whether a message tendered is libelous upon its face if it would protect itself from such liability. A mere reference to the message considered in *Peterson v. Western Union Tel. Co.* 65 Minn. 18, 67 N. W. 646, "Slippery Sam, your name is Pants," or the message held libelous in *Monson v. Lathrop,* 96 Wis. 386, 71 N. W. 596, "The citizens of Wisconsin demonstrated you are an unscrupulous liar," indicates that the agent should be capable of exercising rather exact legal judgment. Where the "station agent" incidentally acts as the telegraph agent in many sparsely settled communities where the business will not permit the employment of a full-time telegraph agent, it is apparent that such competency cannot be secured, in which case the company must assume the risk or withdraw the service. The consultation by the agent with some central office to determine whether the proffered message is proper to be sent would result in delay, violate the statute prohibiting a preference in sending, and constitute a publication as damaging as that resulting from the ordinary transmission of the message. It seems apparent that the tendency of this rule would be to limit service and to deprive communities of the privileges which it affords. On the other hand, the publication arising from the transmission of telegrams in the usual and ordinary way is exceedingly limited in extent. In many instances the only publication is that arising by the transmission from the re-

ceiving to the delivering agent. Of course at other times the message passes through connecting offices, resulting in greater publicity, but in the most aggravating instances publication is exceedingly narrow and restricted, and made to those who have no acquaintance with the libeled party. Their connection with the message is casual, routine, and mechanical. It is simply a part of the day's work, and leaves little if any impression upon the minds of those through whose hands it passes. Substantial damage resulting from such transmission is highly improbable.

The law which licenses telegraph companies imposes no restrictions upon the character of the messages which they shall transmit, although generally heavy penalties are imposed upon all officers and employees of such companies for divulging the contents of messages transmitted over the companies' lines. The statute, perhaps out of consideration for the best of service, has refrained from laying upon the telegraph company the duty and the burden of searching and winnowing the messages tendered to it for transmission, while it seeks to promote the rapid and just transmission of messages by requiring their dispatch in the order tendered. Sec. 348.36, Stats. So far as the written law is concerned, it seems to command telegraph companies to send all messages tendered in the order in which they are received, but to divulge the contents to no one. .

In *Owen v. Ogilview,* 32 App. Div. 465, 53 N. Y. Supp. 1033, a corporation was held immune from liability where the manager dictated a libelous letter to the stenographer in the corporation employ who copied and mailed the same, because there was no publication, in view of the fact that the manager and the stenographer were employed by the same corporation. The stenographer was not to be regarded as a third person in the sense that either the dictation or the subsequent reading could be regarded as a publication by the corporation. This principle was followed in

*Prins v. Holland-North America Mortgage Co.* 107 Wash. 206, 181 Pac. 680; *Central of Georgia R. Co. v. Jones,* 18 Ga. App. 414, 89 S. E. 429; *Cartwright-Caps Co. v. Fischel,* 113 Miss. 359, 74 South. 278; *Globe F. Co. v. Wright,* 265 Fed. 873. While this doctrine was repudiated in the early English cases, Lord ESHER, M. R., saying in *Pullman v. Hill,* [1891] 1 Q. B. 524, that he "did not think that the necessities or the luxuries of business could alter the law of England, and that if a merchant wished to write a letter containing defamatory matter, and keep a copy of the letter, he had better make it himself," the later English cases not only limited the rule laid down in the *Pullman Case* but have adopted the view that the dictation of a letter to a stenographer or a clerk is a privileged communication, COZENS-HARDY, L. J., saying in *Edmondson v. Birch & Co.,* [1907] 1 K. B. 371, "I think that, if we were to accede to the argument for the plaintiff, we should in effect be destroying the defense of privilege in cases of this kind, in which limited companies and large mercantile firms are concerned; for it would be idle in such cases to suppose that such documents as those here complained of could, as a matter of business, be written by, and pass through the hands of, one partner or person only. In the ordinary course of business, such a document must be copied and find its way into the copy-letter book or telegram book of the company or firm. The authorities appear to me to show that the privilege is not lost, so long as the occasion is used in a reasonable manner and in the ordinary course of business." And in *Boxsius v. Goblet Frères,* 1 Q. B. 842, Lord ESHER expressed views quite at variance with his utterance in *Pullman v. Hill,* above quoted.

In a note upon this subject to be found in 18 A. L. R. 776, at 778, it is said: "The more liberal rule, and the one which seemingly has the support of the weight of modern authority, is that, where the communication is made to a

servant or business associate in the ordinary and natural course of business, there is no actionable libel." This seems to be the rule of the Canadian as well as of the English and American decisions. We hold this to be the true rule by which the liability of telegraph companies for actionable libel arising from the transmission of libelous messages should be governed. The transmission of such a message from agent to agent within its own organization in the usual and ordinary course of business should be held to be a privileged communication. It follows that the demurrer to the complaint was properly sustained.

*By the Court.*—Order affirmed.