## O'BRIEN v. WESTERN UNION TELEGRAPH CO.

### No. 3555.

Circuit Court of Appeals, First Circuit.

July 18, 1940.

540

Maurice Caro, of Boston, Mass. (J. Edward Keefe, Jr., of Boston, Mass., on the brief), for appellant.

Arthur P. Hardy and Hardy, Hall & Iddings, all of Boston, Mass. (Francis R. Stark, of New York City, on the brief), for appellee.

Before MAGRUDER, and MAHONEY, Circuit Judges, and SWEENEY, District Judge.

MAGRUDER, Circuit Judge.

This is an action of tort for libel, begun in the Superior Court for Suffolk County, Massachusetts, and later removed to the federal court. The jury returned a verdict for defendant, and the plaintiff appeals from the judgment entered thereon.

From the uncontradicted evidence the following facts appear: In 1936 the plaintiff Thomas C. O'Brien "at the advice of Father Coughlin" became a candidate for the offices of United States Senator from Massachusetts and Vice-President of the United States, on the nomination of the Union Party. On the late afternoon of September 30, 1936, an un-

identified person brought into a branch office of the Western Union Telegraph Company in Boston a message containing 1,461 words, purporting to be signed by one Robert Robinson, to be transmitted to Father Charles E. Coughlin, Royal Oak, Michigan. In regular course the message was sent to the main office in Boston. Within an hour after its receipt at the branch office an operator at the main office had completed the transmission of the message by telctypewriter to Detroit, whence it was relayed to Royal Oak. The only publication relied on is the delivery of the message to Father Coughlin personally, by an employee of the telegraph company.

On its face, the message contained obviously defamatory statements concerning Mr. O'Brien. The purported interest of the sender of the message was that as a prominent and lifelong member of the Democratic Party he feared the adverse effect which the candidacy of Mr. O'Brien might have upon the success of the Democratic ticket. This is the concluding paragraph of the message:

"I SEND YOU THIS STATEMENT WITH A FREE AND OPEN MIND, DELAYING SAME HOPING THAT YOU YOURSELF WOULD DISCOVER THESE FACTS. HOWEVER YOUR FAILURE TO DO SO HAS MOVED ME TO TAKE THE ACTION I AM NOW TAKING, TO NOTIFY YOU THAT AT MY OWN EXPENSE I SHALL FROM THIS DAY THROUGH THE MEDIUM OF THE PUBLIC PLATFORM AND RADIO ENLIGHTEN THE PEOPLE NOT ONLY OF THIS STATE, BUT THROUGHOUT THE NATION THE TRUE CHARACTER AND BACKGROUND OF YOUR CANDIDATE FOR UNITED STATES SENATE AND VICE-PRESIDENT, THOMAS C. O'BRIEN."

Defendant pleaded inter alia that it was privileged to make the publication, and relied principally on this defense. At the close of the evidence, the trial judge denied motions for a directed verdict filed by both parties, and left the case to the jury under instructions on points of law. On this appeal the only question presented is whether the trial judge erred in refusing to rule as a matter of law that the telegraph company was not privileged in transmitting and

delivering the message to Father Coughlin.

In determining the privilege of the defendant to transmit the libellous message in question, we are not bound by the common law or statutes either of Massachusetts, where the message originated, or of Michigan, where it was delivered. The telegram was an interstate message. It was transmitted by common carrier engaged in interstate communication by wire. The telegraph company is subject to the Communications Act of 1934, 48 Stat. 1064, 47 U.S.C.A. §§ 35, 151 et seq., and to regulations thereunder by the Federal Communications Commission. Under § 202(a) of the Act,[1] defendant is forbidden to make any unreasonable discrimination in charges, practices, facilities or services, or to subject any person to unreasonable prejudice or disadvantage. Civil and criminal penalties are provided for violation of these provisions. §§ 202(c), 501–505. §§ 206, 207 cover liability for damages where private injury results from any unlawful act or omission. Congress having occupied the field by enacting a fairly comprehensive scheme of regulation, it seems clear that questions relating to the duties, privileges and liabilities of telegraph companies in the transmission of interstate messages must be governed by uniform federal rules. This conclusion is fortified by decisions under the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., which was applicable to telegraph companies prior to the passage of the Communications Act of 1934. See Western Union Telegraph Co. v. Call Publishing Co., 1901, 181 U.S. 92, 21 S.Ct. 561, 45 L.Ed. 765; Postal Telegraph-Cable Co. v. Warren-Godwin Lumber Co., 1919, 251 U.S. 27, 40 S.Ct. 69, 64 L.Ed. 118; Western Union Telegraph Co. v. Boegli, 1920, 251 U.S. 315, 40 S.Ct. 167, 64 L.Ed. 281; Western Union Telegraph Co. v. Speight, 1920, 254 U.S. 17, 41 S.Ct. 11, 65 L.Ed. 104; Hall v. Western Union Telegraph Co., 1918, 108 S.C. 502, 94 S.E. 870; Poor v. Western Union Telegraph Co., 1917, 196 Mo.App. 557, 196 S.W. 28.

No provision of law expressly defines the duty of telegraph companies to accept and transmit defamatory messages. Such duty as does exist is implicit in the general language of § 202(a) of the Communications Act.[2] The extent of this duty will necessarily be marked out and made explicit in successive decisions of the federal courts interpreting and applying the language of the Act. Penal liability of a telegraph company, and civil liability or immunity to the sender, for failure to transmit a message promptly will necessarily be determined by federal law, not by divergent rules of state law. It would seem that the corresponding liability or immunity of the telegraph company to the person defamed should likewise be determined by uniform federal rules in cases where the telegraph company does transmit and deliver the defamatory message. Notwithstanding Erie Railroad Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, there still exist certain fields—and this is one—where legal relations are governed by a "federal common law", a body of decisional law developed by the federal courts untrammeled by state court decisions. See Hinderlider v. La Plata Co., 1938, 304 U.S. 92, 110, 58 S.Ct. 803, 82 L.Ed. 1202; Board of Commissioners of Jackson County v. United States, 1939, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313; Illinois Central Railroad Co. v. Moore, 5 Cir., 112 F.2d 959, June 20, 1940; McCormick & Hewins, The Collapse of "General" Law in the Federal Courts (1938), 33 Ill.L.Rev. 126, 143–44.

■ The immunity of the telegraph company from liability to a defamed person when it transmits a libellous message must be broad enough to enable the company to render its public service efficiently and with dispatch. Speed is the essence of the service. The number of messages actually handled by the Boston offices of the defendant company on September 30, 1936, the day on which the message now in question was dispatched, was 72,626, according to the testimony of

---

[1] "Sec. [§] 202. (a) It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage."

[2] See footnote 1, supra.

the manager. The average number of domestic revenue messages transmitted by all wire-telegraph and radio telegraph carriers for the last twelve years was almost 200,000,000 messages annually. See Fifth Annual Report, Federal Communications Commission, for the fiscal year ending June 30, 1939, Appendix D, Table VIII, page 123. If the telegraph companies are to handle such a volume of business expeditiously, it is obvious that their agents cannot spend much time pondering the contents of the messages with a view to determining whether they bear a defamatory meaning, and if so, whether the sender might nevertheless be privileged. The effect of putting such a burden upon the telegraph companies could only result in delayed transmission of, and in some cases refusal to transmit, messages which the courts after protracted litigation might ultimately determine to have been properly offered for transmission and which the sender was entitled to have dispatched promptly even though defamatory matter was contained therein.

Manifestly the telegraph company's privilege cannot be restricted to cases in which the sender in fact was privileged, as often he may be. It must be broader than that, and the cases so hold. Nye v. Western Union Telegraph Co., C.C., 104 F. 628; Western Union Telegraph Co. v. Brown, 8 Cir., 294 F. 167; Klein v. Western Union Telegraph Co., 1939, 257 App.Div. 336, 13 N.Y.S.2d 441. See Flynn v. Reinke, 199 Wis. 124, 225 N.W. 742; Young B. Smith, Liability of a Telegraph Company for Transmitting a Defamatory Message (1920) 20 Col.L.Rev. 30, 369. Otherwise the company for its own self-protection would have to be permitted to delay sending the message pending some kind of check-up of the circumstances to which the message relates. After due investigation the company might or might not satisfy itself that the sender was privileged to telegraph the defamatory message. But the inevitable delay would frequently have served to defeat the very purpose for which the sender was given a privilege to use this means of communicating the defamatory matter.

In Am.L.Inst.Restatement of Torts, § 612, it is stated:

"A public utility whose duty it is to transmit messages for the public is privileged to transmit a message although it is obviously defamatory, unless the agents who transmit it know or have reason to know that the sender is not privileged to send it."

Under this rule the telegraph company would often be privileged though the sender was not; and this is undoubtedly the law. When would the agent "know or have reason to know" that the sender is not privileged? We do not understand the American Law Institute statement of the rule to refer only to a knowledge of facts, and to imply that the transmitting agent is assumed to know the law as to what occasions are privileged. Even lawyers, and the judges themselves, often have difficulty in defining what public or private interests are of sufficient importance to justify the recognition of a privilege to publish defamatory matter. For instance, and with special reference to the case at bar, there is a conflict of authority as to whether a citizen has a privilege to publish to his fellow citizens facts, believed by him to be true, affecting the fitness of a candidate for public office. As supporting the privilege, see Coleman v. MacLennan, 78 Kan. 711, 98 P. 281, 20 L.R.A.,N.S., 361, 130 Am.St.Rep. 390; Salinger v. Cowles, 195 Iowa 873, 191 N.W. 167; Friedell v. Blakely Printing Co., 163 Minn. 226, 203 N.W. 974; Briggs v. Garrett, 111 Pa. 404, 2 A. 513, 56 Am. Rep. 274; Fortney v. Stephan, 237 Mich. 603, 213 N.W. 172. Contra, Post Publishing Co. v. Hallam, 6 Cir., 59 F. 530, 539–542; Nevada State Journal Pub. Co. v. Henderson, 9 Cir., 294 F. 60; Washington Times Co. v. Bonner, 66 App.D.C. 280, 86 F.2d 836, 841–843, 110 A.L.R. 393. The cases are collected and discussed in Hallen, Fair Comment, 8 Tex. L.Rev. 41, 53–74. Within a brief space of years the California Supreme Court has reversed itself on the point. Snively v. Record Publishing Co., 185 Cal. 565, 198 P. 1, overruling Dauphiny v. Buhne, 153 Cal. 757, 96 P. 880, 126 Am.St.Rep. 136, which had denied the privilege. The courts have disagreed as to the relative importance on the one hand of the public interest in the selection of good men for public office, and in the disclosure by a citizen of relevant facts honestly believed to be true, without a paralyzing fear of libel suits, and on the other hand, of the private interest of the candidate in the preservation of his reputation as against unmerited attack. It

would be preposterous to formulate a rule of privilege for telegraph companies based upon an assumption that the clerks and operators know the law of Massachusetts or of Michigan on the point, and if there is a diversity, which law governs on conflict of laws principles as applied to the facts of this case. And even as to points of law supposed to be reasonably well settled, it is impractical to impute a knowledge thereof to the busy clerks in telegraph offices. What would happen would surely be a slowing down of service while clerks, instead of mechanically counting the words in proffered messages, carefully scrutinized them to see if they conveyed any defamatory meaning. Any messages which were suspect would then have to be referred to some central office of the company where legal advice was available. Thus not only would the service suffer, and many messages be held up which ought to be sent without delay, but also in causing the message to be circulated through a hierarchy of reviewing employees, the company might often publish the defamatory matter to more persons than would have seen the message had it been transmitted to the sendee in ordinary course.

Our conclusion is that if the telegraph company is ever to be held liable for the routine transmission of a defamatory message, it could only be in the necessarily rare cases where the transmitting agent of the telegraph company happened to know that the message was spurious or that the sender was acting, not in the protection of any legitimate interest, but in bad faith and for the purpose of traducing another.

In the present case it cannot be said that the clerks who handled the message to Father Coughlin knew or had reason to know that the purported sender was not privileged to send it. The trial judge's charge to the jury on the issue of privilege was, if anything, more favorable to the plaintiff, appellant herein, than the facts demanded. It is clear that the plaintiff was not entitled to the requested ruling that as a matter of law the telegraph company was not privileged to transmit the message.

The judgment of the District Court is affirmed, with costs to the appellee.

SWEENEY, District Judge, concurs in the result.