ASI Worldwide v. WorldCom          CV-98-154-B    07/21/00

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

<u>A.S.I. Worldwide
Communications Corp.</u>

    v.                                    Civil No. 98-154-B
                                      Opinion No. 2000 DNH 160

<u>WorldCom, Inc.</u>

### <u>MEMORANDUM AND ORDER</u>

A.S.I. Worldwide Communications Corp. is a reseller of long-distance telephone services.  A.S.I. entered into a contract to purchase long-distance services from a predecessor of WorldCom, Inc., a telecommunications carrier whose activities are regulated by the Federal Communications Act ("FCA"), 47 U.S.C. § 151 <u>et seq.</u>  A.S.I. filed this action seeking damages based on a variety of state law claims after the parties' business relationship broke down.  WorldCom argues in a motion for judgment on the pleadings that A.S.I.'s claims are preempted by the FCA.  Alternatively, it contends that A.S.I.'s claims are barred by the filed rate doctrine.

**I.**

A.S.I. entered into an agreement with WilTel, Inc. in March 1994, under which WilTel promised to provide A.S.I. with its "WilPlus III" long-distance telephone service for a period of three years.[1] In specifying the rates, terms, and conditions of that service, the agreement incorporated by reference the applicable tariff(s) filed by WilTel with the FCC. Under the agreement, A.S.I. promised to generate a minimum of $100,000 in monthly long-distance call volume and furnish WilTel with certain letters of credit. WilTel, in return, promised to provide A.S.I. with a 40% discount on the WilPlus III three-year base rates set

---

[1] WorldCom has appended to its answer a copy of A.S.I.'s application for service (the document that memorializes the parties' original agreement), see Answer and Countercl. (Doc. #9), Ex. A. Because A.S.I.'s complaint refers to and depends upon this agreement, I may consider the document without converting the motion into one for summary judgment. See Beddall v. State Street Bank and Trust Co., 137 F.3d 12, 16-17 (1st Cir. 1998) (under Rule 12(b)(6)); Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").

in its tariff.[2]  WilTel also promised that it would charge A.S.I. an even more favorable rate if A.S.I. delivered more than $200,000 in monthly call volume.

WilTel and A.S.I. entered into an "addendum" to the service agreement in May 1995, in which (1) A.S.I. agreed to generate a minimum of $350,000 in monthly long-distance call volume or to pay that amount as a minimum monthly charge if it failed to achieve that volume, (2) A.S.I. agreed to furnish WilTel with certain cash security deposits and/or letters of credit, (3) WilTel agreed to provide A.S.I. with a 40% discount on the WilPlus III three-year base rates set in the applicable tariff, and (4) WilTel promised to provide A.S.I. with an annual credit

---

[2]  A.S.I. has attached WilTel's FCC No. 5 Tariff to its objection and asserted that this is the tariff referenced in and applicable to the parties' agreement.  See Mem. in Supp. of Pl.'s Obj. (Doc. #18) at 2 & n.2, Appendix.  Because the tariff is an official document and the parties have not disputed its authenticity, I may refer to it without converting WorldCom's motion for judgment on the pleadings into a motion for summary judgment.  See Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993) (concluding that court could consider official public records submitted with plaintiff's opposition when ruling on Rule 12(b)(6) motion without converting motion to one for summary judgment).

equivalent in value to one month of free long-distance usage.[3]

In or about 1995, WorldCom (or more specifically, its predecessor-in-interest) acquired WilTel and assumed WilTel's obligations under the agreement with A.S.I.[4] A.S.I. alleges that WorldCom has breached that agreement and violated the filed tariff by engaging in a variety of wrongful practices.

Many of A.S.I.'s allegations relate to WorldCom's billing practices. For example, A.S.I. claims that WorldCom engaged in double-billing by charging A.S.I. and its customers for the same calls and charging A.S.I. twice for other calls. A.S.I. also contends that WorldCom erroneously billed A.S.I. for services provided to "phantom customers" and/or other resellers not related to A.S.I. A.S.I. further contends that WorldCom's

---

[3] WorldCom has appended a copy of this addendum to its answer. See Answer and Countercl. (Doc. #9), Ex. B. Accordingly, I may refer to that document without converting WorldCom's motion into a motion for summary judgment. See supra note 1.

[4] WorldCom is the parent company of WorldCom Network Services, Inc., the successor company to WilTel. For simplicity's sake, I generally refer to all of these entities as "WorldCom."

billing statements contained unexplained charges and that WorldCom failed to credit A.S.I.'s account for payments made. A.S.I. asserts that WorldCom wrongfully billed A.S.I. for taxes not attributable to A.S.I. and erroneously characterized calls originating from Canada and the Carribean as international calls, in violation of the terms of the filed tariff.

A.S.I. maintains that when it alerted WorldCom to these erroneous charges and refused to pay them, WorldCom responded by imposing finance charges and other fees on A.S.I. A.S.I. also alleges that WorldCom seized its security deposit and demanded that it post a bond to cover the unpaid charges. According to A.S.I., WorldCom threatened to prevent A.S.I. from switching to another provider, to stop providing service to A.S.I., and to take over A.S.I.'s accounts.

A.S.I. also claims that WorldCom effectively refused to deliver the credit referred to in the parties' agreement. According to A.S.I., it was entitled to an annual credit equivalent to the value of one month of free service if its

customers generated more than $200,000 per month in call volume. A.S.I. asserts that it met this condition and that WorldCom provided the credit in May 1995, but that WorldCom immediately increased its charges to A.S.I. to offset the value of the credit. According to A.S.I., this rate increase violated both the parties' agreement and the tariff filed with the FCC.

In addition to the allegations regarding billing practices, A.S.I. alleges that WorldCom engaged in "slamming," an industry term that refers to the unauthorized switching of customers from one reseller's account to the account of another reseller. According to A.S.I., WorldCom both misappropriated A.S.I. customers by "slamming" them from A.S.I.'s account to the accounts of other resellers (including WorldCom itself), and "slammed" non-A.S.I. customers onto A.S.I.'s account. A.S.I. asserts that the former practice caused it to lose customers, while the latter exposed it to legal action from customers of other resellers who had not chosen to deal with A.S.I.

A.S.I. has brought a seven-count complaint claiming that

WorldCom breached the parties' contract (Count I), breached the covenant of good faith and fair dealing implied in that agreement (Count II), tortiously interfered with A.S.I.'s contractual relations with its customers (Count III), converted A.S.I.'s property (Count IV), unjustly enriched itself at A.S.I.'s expense (Count V), defrauded A.S.I. (Count VI), and engaged in unfair and deceptive trade practices in violation of N.H. Rev. Stat. Ann. chapter 358-A (Count VII). A.S.I. requests damages as a remedy for WorldCom's alleged violations, including treble damages, costs, and attorney's fees for WorldCom's allegedly willful violation of N.H. Rev. Stat. Ann. chapter 358-A.

## II.

WorldCom moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The standard for reviewing such a motion is essentially the same as the standard for reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim. See Cooper v. Thomson Newspapers, Inc., 6 F. Supp.2d 109, 112 (D.N.H. 1998) (citing Republic Steel Corp. v.

Pennsylvania Eng'g Corp., 785 F.2d 174, 182 (7th Cir. 1986)).

Accordingly, I "must accept all of the nonmoving party's well-pleaded factual averments as true and draw all reasonable inferences in [that party's] favor." Feliciano v. Rhode Island, 160 F.3d 780, 788 (1st Cir. 1998) (citing Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988)). "Judgment on the pleadings under Rule 12(c) may not be entered unless it appears beyond a doubt that the nonmoving party can prove no set of facts in support of [its] claim which would entitle [it] to relief." Id. (citing Rivera-Gomez, 843 F.2d at 635; Santiago de Castro v. Morales Medina, 943 F.2d 129, 130 (1st Cir. 1991)).

## III.

WorldCom offers two arguments to support its motion for judgment on the pleadings.[5]  It first argues that A.S.I.'s claims

---

[5]  Before turning to the merits of WorldCom's motion, I address A.S.I.'s claim that the motion is untimely.  As A.S.I. indicates in its objection, the discovery plan jointly devised by the parties and approved by the court set December 31, 1998 as the deadline for filing any motions to dismiss and June 30, 2000 as the deadline for filing any motions for summary judgment.  See Mem. in Supp. of Pl.'s Obj. (Doc. #18) at 1, 4; Report of

are preempted by the FCA.  Next, it asserts that all of A.S.I.'s claims except its tortious interference and conversion claims are barred by the filed rate doctrine (sometimes called the "filed tariff doctrine"), as embodied in § 203 of the FCA.  I address each argument in turn.

## A.  Preemption

Congress's preemption power flows from the Supremacy Clause

Parties' Planning Meeting (Doc. #11) at 3.  While a motion for judgment on the pleadings should be treated as a motion to dismiss rather than a motion for summary judgment for purposes of these deadlines, I decline to reject WorldCom's motion on the ground that it is untimely.  To mechanically enforce the discovery plan deadline in this case would exalt form over substance, particularly because WorldCom could (and presumably would) present the same arguments contained in its present motion in a timely motion for summary judgment.  This resolution of the timeliness issue is consistent with the language of Rule 12(c), which allows for the filing of a motion for judgment on the pleadings "[a]fter the pleadings are closed but within such time as not to delay the trial."  Fed. R. Civ. P. 12(c).  WorldCom's motion was unmistakably filed within the broad time frame envisioned in the rule.  Consequently, I will consider the motion on its merits notwithstanding the discovery plan deadline. A.S.I. suffers no prejudice as a result because I will similarly relax the deadline for the amendment of pleadings to the extent that A.S.I. wishes to amend its complaint in an effort to cure the legal deficiencies identified in this memorandum and order.

of the United States Constitution, see U.S. Const. art. VI, cl. 2, which "invalidates state laws that 'interfere with, or are contrary to,' federal law."[6] Hillsborough County, Florida v. Automated Med. Labs., Inc., 471 U.S. 707, 712 (1985) (quoting Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824)); see also Louisiana Pub. Serv. Comm'n v. Federal Communications Comm'n, 476 U.S. 355, 368 (1986); Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 67 (1st Cir. 1997). The crucial question in any preemption analysis is whether Congress intended to supersede state law. See Gade v. National Solid Wastes Management Ass'n, 505 U.S. 88, 96 (1992); Louisiana Pub. Serv.

---

[6] The parties blur the important distinction between the jurisdictional doctrine of complete preemption and the more familiar defense of ordinary preemption. "Stated simply, complete preemption functions as a narrowly drawn means of assessing federal removal jurisdiction, while ordinary preemption operates to dismiss state claims on the merits and may be invoked in either federal or state court." BLAB T.V. of Mobile, Inc. v. Comcast Cable Communications, Inc., 182 F.3d 851, 854-55 (11th Cir. 1999). The doctrine of complete preemption is inapplicable here because A.S.I. brought its complaint in federal court based on an uncontested assertion that this court has subject matter jurisdiction over the action based on diversity of citizenship. See Compl. (Doc. #1) ¶ 3; Answer and Countercl. (Doc. #9) ¶ 3.

Comm'n, 476 U.S. at 369. "To discern Congress' intent [a court must] examine the explicit statutory language and the structure and purpose of the statute." Gade, 505 U.S. at 96 (quoting Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138 (1990)) (internal quotation marks omitted). A court performing preemption analysis "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress." Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992) (quoting Rice v. Sante Fe Elevator Corp., 331 U.S. 218, 230 (1947)) (internal quotation marks omitted); see also Greenwood Trust Co. v. Massachusetts, 971 F.2d 818, 823 (1st Cir. 1992). The First Circuit has noted that "[c]ourts must tread cautiously in this arena because the authority to displace a sovereign state's law is 'an extraordinary power . . . that [a court] must assume Congress does not exercise lightly.'" Greenwood Trust, 971 F.2d at 823 (quoting Gregory v. Ashcroft, 501 U.S. 452, 460 (1991)).

The Supreme Court has identified three main types of preemption: express preemption, field preemption, and conflict preemption.  While these categories are analytically useful, they are not "rigidly distinct," English v. General Elec. Co., 496 U.S. 72, 79 n.5 (1990); see also Philip Morris, 122 F.3d at 68 n.18, and none "provides an infallible constitutional test or an exclusive constitutional yardstick."  Hines v. Davidowitz, 312 U.S. 52, 67 (1941).  At the same time, the Court has recognized that "[f]requently, the pre-emptive 'label' we choose will carry with it substantive implications for the scope of pre-emption." Gade, 505 U.S. at 104 n.2.  WorldCom's preemption argument, although framed in very general terms, clearly qualifies as an assertion that the FCA preempts the field of state regulation in the interstate communications area.

Field preemption occurs when a federal law demonstrates that Congress intended to occupy an entire field of regulation exclusively.  See Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995) (citing English, 496 U.S. at 78-79); Louisiana Pub. Serv.

Comm'n, 476 U.S. at 368.  A Congressional intent to occupy the field "may be inferred from a 'scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' or where an Act of Congress 'touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'"  English, 496 U.S. at 79 (quoting Rice, 331 U.S. at 230); see also Hillsborough County, 471 U.S. at 713; Philip Morris, 122 F.3d at 68.  For a court to conclude that Congress intended a given federal statutory scheme to supersede state laws in an entire field of regulation, Congress's preemptive purpose must be "clear and manifest."  Jones v. Rath Packing, 430 U.S. 519, 525 (1977) (quoting Rice, 331 U.S. at 230) (internal quotation marks omitted).

Although the FCA indisputably constitutes a wide-ranging regulatory measure, see United States v. Southwestern Cable Co., 392 U.S. 157, 168 (1968) (noting that the FCA's "terms, purposes,

-13-

and history all indicate that Congress 'formulated a unified and comprehensive regulatory system for the (broadcasting) industry'") (quoting <u>Federal Communications Comm'n v. Pottsville Broad. Co.</u>, 309 U.S. 134, 137 (1940)); <u>Benanti v. United States</u>, 355 U.S. 96, 104 (1957) (describing FCA as "a comprehensive scheme for the regulation of interstate communication"), the Supreme Court has stated that "[t]o infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive." <u>Hillsborough County</u>, 471 U.S. at 717. "Such a rule," the Court has concluded, "would be inconsistent with the federal-state balance embodied in [the Court's] Supremacy Clause jurisprudence." <u>Id.</u> (citing <u>Rath Packing</u>, 430 U.S. at 525). In <u>Head v. New Mexico Board of Examiners in Optometry</u>, 374 U.S. 424 (1963), the Court similarly explained that the validity of a preemption claim "cannot be judged by reference to broad statements about the 'comprehensive' nature of federal regulation

under the Federal Communications Act." Id. at 429-30.

In Head, the Supreme Court concluded that the FCA did not exclusively occupy the field so as to preempt a state law regulating radio advertising. See id. at 431-32. In his concurring opinion, Justice Brennan cited the FCA's "savings clause," 47 U.S.C. § 414,[7] as evidence that Congress did not intend the FCA to preempt all state regulation in the telecommunications field. See id. at 443-44 (Brennan, J., concurring). According to Justice Brennan, the savings clause, along with certain other provisions of the FCA, "suggest a congressional design to leave standing various forms of state regulation." Id. at 443 (Brennan, J., concurring).[8] Justice

_____

[7] The savings clause provides:

Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies.

47 U.S.C.A. § 414 (West 1991).

[8] The First Circuit has also held that the savings clause preserves certain claims against common carriers subject to regulation under the FCA. See Comtronics, Inc. v. Puerto Rico

Brennan also noted that while the portion of the FCA regulating telephone and telegraph services was more comprehensive than the portion dealing with radio and television broadcasting, "even as to [the former] means of communications some subjects and remedies are saved to state regulation." Id. at 444 (Brennan, J., concurring).

In light of the existence of the FCA's savings clause and the Supreme Court's holding in Head, I cannot reasonably infer that Congress manifested a clear intention to occupy the entire interstate telecommunications field to the exclusion of any state regulation in that area. Accordingly, I conclude that A.S.I.'s claims are not superseded by virtue of a broad conception of field preemption.

WorldCom's argument to the contrary largely depends upon Ivy Broadcasting Co. v. American Telephone and Telegraph Co., 391 F.2d 486 (2d Cir. 1968), and its progeny. See Mem. in Supp. of

Tel. Co., 553 F.2d 701, 707 n.6 (1st Cir. 1977) ("[W]e read s 414 as preserving causes of action for breaches of duties distinguishable from those created under the Act, as in the case of a contract claim.").

-16-

Def.'s Mot. for J. on the Pleadings (Doc. #17) at 6-7 (citing, inter alia, Ivy Broadcasting, 391 F.2d at 491; Nordlicht v. New York Tel. Co., 799 F.2d 859, 862, 864 (2d Cir. 1986); Gelb v. American Tel. & Tel. Co., 813 F. Supp. 1022, 1025 (S.D.N.Y. 1993); MCI Communications Corp. v. Graphnet, Inc., 881 F. Supp. 126, 131-32 (D.N.J. 1995)). However, WorldCom's reliance on these cases is misplaced for several reasons. First, the cases are inconsistent with the Supreme Court's modern preemption jurisprudence, which requires that Congress clearly manifest its intention to broadly preempt all state law in an entire field of regulation.[9] See Rath Packing, 430 U.S. at 525. Second, many other courts have declined to follow Ivy Broadcasting because

---

[9] The Second Circuit has recently held that Nordlicht, which depended in part on Ivy Broadcasting, is no longer good law insofar as it is inconsistent with the Supreme Court's complete preemption analysis in Metropolitan Life Insurance Co. v. Taylor, 481 U.S. 58 (1987). See Fax Telecommunicaciones Inc. v. AT&T, 138 F.3d 479, 486 (2d Cir. 1998); Marcus v. AT&T Corp., 138 F.3d 46, 54-55 (2d Cir. 1998). Although Metropolitan Life dealt with complete preemption rather than field preemption, the Supreme Court has emphasized the primary importance of a clear manifestation of preemptive intent on the part of Congress in both contexts.

(among other reasons) it failed to consider the effect of the FCA's savings clause. See, e.g., Corporate Housing Sys., Inc. v. Cable & Wireless, Inc., 12 F. Supp.2d 688, 692 (N.D. Ohio 1998); Heichman v. American Tel. and Tel. Co., 943 F. Supp. 1212, 1220 (C.D. Cal. 1995); American Inmate Phone Sys., Inc. v. US Sprint Communications Co. Ltd. Partnership, 787 F. Supp. 852, 855-56 (N.D. Ill. 1992).

Although WorldCom does not cite it, the First Circuit's opinion in O'Brien v. Western Union Telephone Co., 113 F.2d 539 (1st Cir. 1940), could be read to support the contention that the FCA (or federal common law) broadly preempts state law in the telecommunications field. See O'Brien, 113 F.2d at 541 ("Congress having occupied the field by enacting a fairly comprehensive scheme of regulation, it seems clear that questions relating to the duties, privileges and liabilities of telegraph companies in the transmission of interstate messages must be governed by uniform federal rules"). To the extent that O'Brien supports this conclusion, however, it is inconsistent with the

Supreme Court's subsequent decision in Head.  Moreover, O'Brien,
like Ivy Broadcasting, failed to consider the FCA's savings
clause.  Accordingly, neither O'Brien nor Ivy Broadcasting
justifies WorldCom's claim that the FCA preempts the field of all
possible state law claims in the interstate telecommunications
area.

B.  **Filed Rate Doctrine**

WorldCom's second argument is that the bulk of A.S.I.'s
claims are barred by the filed rate doctrine.  This doctrine has
its roots in Supreme Court cases decided under the Interstate
Commerce Act (ICA), but has since "been extended across the
spectrum of regulated utilities."  Arkansas Louisiana Gas Co. v.
Hall, 453 U.S. 571, 577 (1981) [hereinafter "Arkla"].[10]  In its
classic form, the doctrine "forbids a regulated entity to charge
rates for its services other than those properly filed with the

---

[10]  Because the FCA was modeled after the ICA, the Supreme
Court has often turned to cases interpreting the latter when
faced with issues raised under the former.  See American Tel. and
Tel. Co. v. Central Office Tel., Inc., 524 U.S. 214, 222 (1998);
MCI Telecommunications Corp. v. American Tel. & Tel. Co., 512
U.S. 218, 229-30 (1994).

appropriate federal regulatory authority."  Id.; see also Town of Norwood, Massachusetts v. Federal Energy Regulatory Comm'n, 202 F.3d 392, 400 & n.4 (1st Cir. 2000) [hereinafter "Norwood I"] (decided under Federal Power Act), petition for cert. filed, (U.S. May 30, 2000) (No. 99-1914).  Thus, a common carrier and its customer may not "contract around" the filed rate.  See Arkla, 453 U.S. at 582 ("[U]nder the filed rate doctrine, when there is a conflict between the filed rate and the contract rate, the filed rate controls . . . . [T]o permit parties to vary by private agreement the rates filed with the Commission would undercut the clear purpose of the Congressional scheme . . . ."); Town of Norwood, Massachusetts v. New England Power Co., 202 F.3d 408, 416 (1st Cir. 2000) [hereinafter "Norwood II"] (decided under Federal Power Act) ("[T]he filed rate doctrine . . . prefers a prevailing tariff . . . over any separate contractual arrangements . . . ."), petition for cert. filed, (U.S. May 30, 2000) (No. 99-1913).

The Supreme Court has provided the following elucidation of

the filed rate doctrine:

> The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier. . . . This stringent rule prevails, because otherwise the paramount purpose of Congress -- prevention of unjust discrimination -- might be defeated.

Maislin Indus., U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, 126 (1990) (quoting Keogh v. Chicago & Northwestern Ry. Co., 260 U.S. 156, 163 (1922)) (internal quotation marks omitted); see also Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409, 416-17 (1986). Thus, where the filed rate doctrine applies, state law claims are preempted. As the Supreme Court has observed, "[i]n this application, the doctrine is not a rule of administrative law designed to ensure that federal courts respect the decisions of federal administrative agencies, but a matter of enforcing the Supremacy Clause." Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953, 963 (1986).

Two basic principles lie at the core of the filed rate

doctrine.  First, the doctrine is intended to ensure that regulated companies charge only those rates that have been filed with the appropriate regulatory agency.  See Arkla, 453 U.S. at 577-78.  This consideration has been described as the doctrine's "nondiscrimination strand," because it "prevent[s] carriers from engaging in price discrimination as between ratepayers."  Fax Telecommunicaciones, Inc. v. AT&T, 138 F.3d 479, 489 (2d Cir. 1998) (quoting Marcus v. AT&T Corp., 138 F.3d 46, 58 (2d Cir. 1998)) (internal quotation marks omitted); see also Cahnmann v. Sprint Corp., 133 F.3d 484, 487 (7th Cir.), cert. denied, 524 U.S. 952 (1998).  Second, the doctrine serves to protect federal regulatory agencies' authority over rate-setting.  See Arkla, 453 U.S. at 577-78.  This aspect of the doctrine has been referred to as the "nonjusticiability strand," because it prevents courts from adjudicating the reasonableness of filed rates.  See Fax Telecommunicaciones, 138 F.3d at 489 (citing Marcus, 138 F.3d at 58).

The filed rate provisions of the FCA are contained in § 203

of the statute. Under § 203(a), common carriers are required to file with the FCC "schedules" or tariffs "containing all their 'charges' for interstate services and all 'classifications, practices and regulations affecting such charges.'" <u>American Tel. and Tel. Co. v. Central Office Tel., Inc.</u>, 524 U.S. 214, 217 (1998) [hereinafter "<u>Central Office</u>"] (quoting 47 U.S.C. § 203(a)). Section 203(c) provides that no carrier shall

> (1) charge, demand, collect, or receive a greater or less or different compensation for such communication, or for any service in connection therewith, between the points named in any such schedule than the charges specified in the schedule then in effect, or (2) refund or remit by any means or device any portion of the charges so specified, or (3) extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule.

47 U.S.C.A. § 203(c) (West 1991). A common carrier that violates the FCA is liable to a person injured by the violation for consequential damages and a reasonable attorney's fee. <u>See</u> 47 U.S.C.A. § 206 (West 1991). Section 207, the FCA's civil enforcement provision, provides that a person claiming to be

injured by a carrier subject to the Act may either make a complaint to the FCC or bring suit in federal district court, but may not pursue both remedies. See 47 U.S.C.A. § 207 (West 1991).

The Supreme Court has held that these provisions, which were modeled after similar provisions of the ICA, demonstrate that "the century-old 'filed-rate doctrine' associated with the ICA tariff provisions applies to the Communications Act as well." Central Office, 524 U.S. at 222. Indeed, the Court has described the FCA's filed rate provisions as "the centerpiece of the Act's regulatory scheme," MCI Telecommunications Corp. v. American Tel. & Tel. Co., 512 U.S. 218, 220 (1994), and as "the heart of the common-carrier section of the Communications Act." Id. at 229.

The Supreme Court recently revisited the filed rate doctrine in the context of the telecommunications field in American Telephone and Telegraph Co. v. Central Office Telephone, Inc., 524 U.S. 214 (1998). In Central Office, a reseller of long-distance communications services sued its carrier, claiming that the carrier had breached the parties' contract (as well as the

covenant of good faith and fair dealing implied therein) and had tortiously interfered with contractual relationships between the reseller and its customers. See id. at 216, 220. The Supreme Court held that these state law claims were preempted by the filed rate doctrine because they sought enforcement of promises that deviated from, or conflicted with, the terms of the carrier's filed tariff. See id. at 220, 224-28. The claims were not preserved by the FCA's savings clause, according to the Court, because "[a] claim for services that constitute unlawful preferences or that directly conflict with the tariff . . . cannot be 'saved' under § 414." Id. at 227.

The reseller's claims in Central Office related to "the provisioning of services and billing," rather than "rates or ratesetting." Id. at 223 (internal quotation marks and citation omitted). Although the Ninth Circuit Court of Appeals had taken the view that the filed rate doctrine did not apply to such claims, the Supreme Court rejected this narrow interpretation of the doctrine's scope. See id. at 223-24. Instead, the Court

read the literal language of § 203 to require that the doctrine apply not only to claims involving "charges" or rates, but also to claims concerning services, i.e., the "classifications, practices, and regulations affecting such charges." Id. (quoting 47 U.S.C. §§ 203(a) & (c)) (internal quotation marks omitted).

Central Office thus stands for the proposition that the filed rate doctrine bars a state law claim that seeks a remedy that would deviate from or conflict with the terms of the filed tariff. As the Court explained, "[t]he rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier." Central Office, 524 U.S. at 227 (quoting Keogh, 260 U.S. at 163) (internal quotation marks omitted).

A.S.I. argues that Central Office is distinguishable because the state law claims at issue here merely seek to enforce the tariff whereas the claims considered in Central Office were all inconsistent with the tariff.[11] I reject this attempt to

_____

[11] While I assume for purposes of analysis that A.S.I. is correct in asserting that its claims are consistent with the tariff, this assumption is questionable at least with respect to its Consumer Protection Act claim. To the extent that A.S.I.

-26-

distinguish <u>Central Office</u>.

The Seventh Circuit applied the filed rate doctrine to bar the litigation of state law claims that seek to enforce the terms of a filed tariff in <u>Cahnmann</u>, 133 F.3d at 488-89.[12]  In <u>Cahnmann</u>, a group of customers brought a class action against their communications carrier, claiming breach of contract and fraud based on the carrier's alleged alteration of the terms of its long-distance telephone plan.  <u>See</u> <u>id.</u> at 486-87, 490.  The Seventh Circuit reasoned that in light of the FCA's tariff-filing

---

were to succeed on this claim and obtain treble damages, it would effectively obtain a more favorable rate than the tariff permits. Accordingly, it could be argued that at least the Consumer Protection Act claim is inconsistent with the tariff.  <u>Cf.</u> <u>Norwood I</u>, 202 F.3d at 400 n.4 (noting that the filed rate doctrine "has evolved into a much broader limitation on civil lawsuits that have the effect of contradicting or undercutting a tariffed rate regulated by a federal agency"); <u>Norwood II</u>, 202 F.3d at 419 ("[O]ne rationale of the filed rate doctrine is to prevent discriminatory damage awards to different customers . . . .").

[12]  While I agree with the <u>Cahnmann</u> court's conclusion that the filed rate doctrine bars state court claims that depend upon the filed tariff, I disagree with its conclusion that such claims are completely preempted and, therefore, are removable to federal court.

regime, under which a carrier is barred from offering services on terms that deviate from the applicable tariff, the only legally binding agreements between the parties were the applicable tariffs filed by the carrier with the FCC. See id. at 487. In other words, the court determined that the parties had no contract apart from the tariffs. See id. (concluding that "the filed tariff is the contract between the plaintiff[s] . . . and Sprint"). After the Cahnmann court collapsed the distinction between the contract and the tariffs, it concluded that a state law suit to enforce the terms of a tariff would be preempted by the FCA. See id. at 488-89.[13] The court justified this conclusion by stating that "since the federal regulation [i.e., the tariff] defines the entire contractual relation between the parties, there is no contractual undertaking left over that state law might enforce." Id. at 489. I agree with the Cahnmann court that a state law claim that falls within the scope of a

_____

[13] The Cahnmann court also foreshadowed Central Office, which was decided approximately six months later, by concluding that state law claims seeking to challenge the terms of a filed tariff were similarly preempted. See 133 F.3d at 488.

-28-

communications carrier's tariff is preempted, regardless of whether it seeks to challenge or enforce the terms of the tariff. This result flows from the special character of a carrier's filed tariff. Under the tariff-filing regime embodied in § 203 of the FCA, a carrier's tariff has the force of federal law. See Fax Telecommunicaciones, 138 F.3d at 488; Marcus, 138 F.3d at 56; Cahnmann, 133 F.3d at 488-89. Because the filed tariff is "the exclusive source of the terms and conditions by which the common carrier provides to its customers the services covered by the tariff," Central Office, 524 U.S. at 230 (Rehnquist, C.J., concurring); see also Marcus, 138 F.3d at 56 (stating that "tariffs conclusively and exclusively enumerate the rights and liabilities of the contracting parties") (quoting American Tel. & Tel. Co. v. New York City Human Resources Admin., 833 F. Supp. 962, 970 (S.D.N.Y. 1993)), it necessarily displaces any state law basis for adjudicating those terms and conditions. See Cahnmann, 133 F.3d at 489-90; see also MFS Int'l, Inc. v. International TelCom Ltd., 50 F. Supp.2d 517, 520-21 (E.D. Va. 1999)

(concluding that telecommunication customer's breach of contract claims, to the extent that they survive preemption, must be recharacterized as federal claims arising under the FCA).

While it might be argued that the FCA's tariff-filing regime is not threatened by state law causes of action that merely seek to enforce a filed tariff, the proliferation of such causes of action inevitably would result in an enforcement system in which the plaintiff's right to relief would vary depending upon the particular state law that governs the parties' relationship. Such variability is inconsistent with the nondiscrimination principle that lies at the heart of the filed rate doctrine. Cf. Norwood II, 202 F.3d at 419 ("[O]ne rationale of the filed rate doctrine is to prevent discriminatory damage awards to different customers . . . ."); Fax Telecommunicaciones, 138 F.3d at 489 (noting that an award of damages for plaintiff's state law claim "effectively would allow [plaintiff] to pay a lower rate than other . . . customers, in violation of the nondiscrimination strand of the filed rate doctrine"); Marcus, 138 F.3d at 61

(same).  Accordingly, the filed rate doctrine applies to state law claims to enforce a filed tariff and A.S.I.'s claims will be barred if they are either inconsistent with or seek to enforce the tariff.

In Count I of its complaint, A.S.I. claims that WorldCom breached the parties' agreement by, inter alia, overcharging A.S.I. and charging A.S.I. for services provided to unrelated customers.[14]  See Compl. (Doc. #1) ¶ 21.  In Count II, A.S.I. claims that WorldCom's actions breached the covenant of good faith and fair dealing implied in the agreement.  See id. ¶¶ 24, 25.  To determine whether these claims are preempted under the filed rate doctrine, I must decide whether they seek to enforce rights and/or duties that are inconsistent with or depend upon WorldCom's tariff.  Any such claims are preempted under the filed rate doctrine.

---

[14]  Although A.S.I. refers to its slamming allegations in relation to its contract claim, see Compl. (Doc. #1) ¶ 21, the only reasonable reading of the complaint as a whole suggests that those allegations relate solely to the tortious interference and conversion claims.

-31-

Several provisions of the tariff relate to billing practices. One such provision states that "[t]he Authorized User which has been designated as the Customer will be billed for all components of the Service (including the Minimum Monthly Charge, if any, relevant to the account for the Authorized User) and will be responsible for all payments to the Company." Pl.'s Obj. (Doc. #18), Appendix § II.6.03(b) at 35. Another provision specifies that "[t]he Customer is responsible for payment of all charges for Services furnished to the Customer or its Authorized Users." Id. § II.7.01 at 39. Taken together, these provisions support a reasonable inference that WorldCom is entitled -- indeed, required -- under the tariff to charge its customers for all services attributable to their account, but is not authorized to charge customers for services furnished to unrelated persons or to otherwise charge customers for services that they did not request or receive.

A.S.I.'s allegations that WorldCom overcharged it by billing it for calls made by "phantom" (i.e., non-A.S.I.) customers, that

WorldCom engaged in various forms of double-billing, and that WorldCom levied other erroneous charges against it can all be read as seeking enforcement of A.S.I.'s right under the tariff to pay only for the services it requested and received. Accordingly, I conclude that A.S.I.'s claims for breach of contract and breach of an implied covenant of good faith and fair dealing are preempted by the filed rate doctrine.

In Count V, A.S.I. claims that WorldCom unjustly enriched itself at A.S.I.'s expense by overcharging A.S.I., by failing to credit A.S.I.'s account for payments made, by withholding credits to which A.S.I. was entitled, by asserting unwarranted interest penalties against A.S.I., and by seizing A.S.I.'s security deposit. See Compl. (Doc. #1) ¶¶ 37-38. This claim, like A.S.I.'s claims for breach of contract and implied covenant, is primarily founded on the contention that WorldCom failed to charge and credit A.S.I.'s account as required under the terms of the tariff. Therefore, the unjust enrichment claim seeks to enforce rights and/or duties created by the tariff.

This claim also rests in part on the allegation that WorldCom effectively failed to provide A.S.I. with an incentive credit equivalent to the value of one month of free service, in contravention of the parties' agreement. Because WorldCom's promise to deliver such a credit is covered by an express provision of its tariff, see Pl.'s Obj. (Doc. #18), Appendix ¶ V.1 at 72, this aspect of A.S.I.'s unjust enrichment claim similarly intrudes upon the territory staked out by the tariff.

In Count VI, A.S.I. charges WorldCom with fraud. See Compl. (Doc. #1) ¶¶ 39-43. Read in the most favorable light, A.S.I.'s fraud claim -- although pleaded in general terms[15] -- asserts that the billing statements that WorldCom sent to A.S.I. were fraudulent because WorldCom (1) misrepresented the cost of the

_____

[15] Federal Rule of Civil Procedure 9(b) mandates that "[i]n all averments of fraud . . . , the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b). The First Circuit has interpreted Rule 9 to require that a plaintiff claiming fraud specify the time, place, and content of allegedly false representations. See Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996). A.S.I.'s failure to plead fraud with particularity is an independent and sufficient basis for dismissing the fraud claim.

services rendered to A.S.I. by listing charges in excess of the rate chargeable under the tariff, and (2) charged A.S.I. for services that it did not request or receive.[16] See id. ¶ 40. In other words, A.S.I. alleges that WorldCom committed fraud by willfully overcharging A.S.I. in breach of the parties' agreement and WorldCom's tariff. As such, A.S.I.'s fraud claim is wholly derivative of its breach of contract claim and is therefore barred by the filed rate doctrine for the reasons set forth in the analysis of that claim. Cf. Central Office, 524 U.S. at 226-28 (noting that filed rate doctrine bars both contract claim and tortious interference claim that was "wholly derivative" of contract claim); Cahnmann, 133 F.3d at 490 (deciding that because "in this case 'fraud' is just another name for 'breach of contract,'" plaintiffs' fraud claim was preempted for the same

---

[16] Although the complaint alludes to slamming in the context of the fraud claim, see Compl. (Doc. #1) ¶ 40 ("The Defendant knew it had no right to move A.S.I.'s customers from A.S.I.'s account."), it is impossible based on the current complaint to determine what connection, if any, exists between A.S.I.'s slamming allegations and its allegations that WorldCom engaged in fraud by making intentional misrepresentations.

-35-

reasons as their contract claim).  Moreover, A.S.I.'s fraud claim -- like its claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment -- seeks enforcement of rights and duties that are consistent with and dependent upon WorldCom's tariff.  Accordingly, the fraud claim is barred by the filed rate doctrine.[17]

A.S.I.'s claim under the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. chapter 358-A (Count VII), see Compl. (Doc. #1) ¶¶ 44-49, is pleaded in an even more cursory manner than its fraud claim.  Although it is difficult to ascertain the basis for the consumer protection claim as pleaded, I determine that this claim most reasonably can be construed to allege that WorldCom engaged in unfair and/or deceptive trade practices by overcharging A.S.I. or otherwise acting in a manner inconsistent

_____

[17]  A.S.I.'s fraud claim, as I construe it, is distinguishable from a claim that a carrier fraudulently misrepresented the terms of the applicable tariff to induce a customer to sign up for the tariffed service.  Nevertheless, such a claim would also be barred by the filed rate doctrine, which prevents a customer from seeking to hold a carrier to a promise to provide a rate or service that deviates from the terms of the carrier's filed tariff.  See Central Office, 524 U.S. at 222-28.

with the terms of the filed tariff. Accordingly, the consumer protection claim is barred by the filed rate doctrine.

In Count III, A.S.I. charges that WorldCom tortiously interfered with A.S.I.'s contractual relations with third parties by slamming A.S.I. customers onto the accounts of other resellers, including WorldCom. See Compl. (Doc. #1) ¶ 30. In Count IV, A.S.I. maintains that this conduct also constituted willful and wrongful conversion of A.S.I.'s property. See id. ¶¶ 32-35. Although WorldCom has not included A.S.I.'s tortious interference and conversion claims in its filed rate doctrine challenge, see Mem. in Supp. of Def.'s Mot. for J. on the Pleadings (Doc. #17) at 3, 8, 11, 13, I note for the sake of completeness that the filed rate doctrine does not bar these two claims. Careful scrutiny of the tariff reveals no provision relating to the practice of slamming. A.S.I.'s claims for tortious interference and conversion therefore neither depend upon nor challenge any term or condition contained in the tariff. Rather, they seek to enforce legal duties (i.e., the duty to

refrain from interfering with another's contractual relations with third parties and the duty to refrain from converting the property of another) that lie outside the scope of the tariff. Such claims, which do not implicate the FCA's tariff-filing regime, are preserved by § 414 of the FCA and are not barred by the filed rate doctrine.[18] See Access Telecom, Inc. v. MCI Telecommunications Corp., 197 F.3d 694, 711 (5th Cir. 1999) (holding that the filed rate doctrine did not preempt plaintiff's

---

[18] As Chief Justice Rehnquist explained in his concurrence in Central Office:

> The tariff does not govern . . . the entirety of the relationship between the common carrier and its customers. For example, it does not affect whatever duties state law might impose on [a carrier] to refrain from intentionally interfering with [a reseller's] relationships with its customers by means other than failing to honor unenforceable side agreements, or to refrain from engaging in slander and libel, or to satisfy other contractual obligations. The filed rate doctrine's purpose is to ensure that the filed rates are the exclusive source of the terms and conditions by which the common carrier provides to its customers the services covered by the tariff. It does not serve as a shield against all actions based in state law.

Central Office, 524 U.S. at 230-31 (Rehnquist, C.J., concurring).

tortious interference claim because the claim did "not concern the provision of services which are covered by the filed tariff, but rather . . . concern[ed] illegal actions outside of the scope of the tariff"), petition for cert. filed, 68 U.S.L.W. 3726 (U.S. May 15, 2000) (No. 99-1822); Cooperative Communications, Inc. v. AT&T, 31 F. Supp.2d 1317, 1321 (D. Utah 1999) (holding that filed rate doctrine did not bar claim based on allegations that carrier wrongfully interfered with plaintiff's relations with third-party customers); cf. Comtronics, Inc. v. Puerto Rico Tel. Co., 553 F.2d 701, 707 n.6 (1st Cir. 1977) ("[W]e read [the FCA's savings clause] as preserving causes of action for breaches of duties distinguishable from those created under the Act . . . .").

**IV.**

Nothing in the language, structure, or purpose of the FCA demonstrates that Congress clearly intended to preempt all state law causes of action in the telecommunications field. Accordingly, A.S.I.'s claims are not barred by field preemption. Nevertheless, because A.S.I.'s claims for breach of contract

-39-

(Count I), breach of the implied covenant of good faith and fair dealing (Count II), unjust enrichment (Count V), fraud (Count VI) and violation of the New Hampshire Consumer Protection Act, Rev. Stat. Ann. chapter 358-A (Count VII), all seek enforcement of rights and/or duties that are consistent with and/or dependent upon WorldCom's tariff, those claims are barred by the filed rate doctrine. Accordingly, WorldCom's motion for judgment on the pleadings (Doc. #17) is granted as to Counts I, II, V, VI and VII.[19]

WorldCom does not direct its argument under the filed rate doctrine to A.S.I.'s claims for tortious interference with contractual relations (Count III) and conversion (Count IV). Because these claims seek to enforce rights and/or duties that arise outside the scope of WorldCom's tariff, they are not preempted under the filed rate doctrine. Accordingly, because these claims are not subject to field preemption and are not

_____

[19]  I note that A.S.I. is free to amend its complaint to bring federal law claims, under the appropriate sections of the FCA, based on allegations that WorldCom violated the terms of its tariff.

barred by the filed rate doctrine, I deny WorldCom's motion for judgment on the pleadings (Doc. #17) as to Counts III and IV.[20]

SO ORDERED.

                                        _____

                                        Paul Barbadoro
                                        Chief Judge

July   , 2000

cc:  Jack B. Middleton, Esq.
     Michael Bongiorno, Esq.

---

[20] Like other courts, I recognize that the tariff-filing regime and the attendant filed rate doctrine may be ill adapted to the contemporary telecommunications market. As the Supreme Court has noted, however, "such considerations address themselves to Congress, not to the courts." MCI Telecommunications Corp. v. American Tel. & Tel. Co., 512 U.S. 218, 234 (1994) (citation and internal quotation marks omitted).